UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                            :

A.W. and T.W., individually and on behalf of  :
their minor son, M.W.,                         :

                             Plaintiffs,   :

               - against -          :

                                            :

NEW YORK CITY DEPARTMENT OF      :
EDUCATION,                             :

                         Defendant.   :

-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/21/2018__

15-CV-3534 (VSB)

**OPINION & ORDER**

Appearances:

Deborah A. Ezbitski
Law Office of Deborah A. Ezbitski
Harrison, New York
*Counsel for Plaintiffs*

William B. Scoville, Jr.
*for* Zachary W. Carter
Corporation Counsel, City of New York
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Before me are the parties' cross-motions for summary judgment in this action brought by

Plaintiffs A.W. and T.W. (collectively, the "Parents"), individually and on behalf of their minor

son, M.W. (collectively, "Plaintiffs"), pursuant to the Individuals with Disabilities Education

Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Because I find that Defendant New York

City Department of Education ("DOE" or "Defendant") failed to offer M.W. a free and

appropriate public education, that Plaintiffs' unilateral placement was appropriate, and that

equitable considerations weigh in Plaintiffs' favor, Plaintiffs' motion is GRANTED and

Defendant's cross-motion is DENIED.

## I. Legal Standard

### A. *Statutory Framework*

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)–(B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) (finding that a court could award tuition reimbursement to the parents of children not provided a free appropriate public education). "The IDEA offers federal funds to states that develop plans to assure 'all children with disabilities' [residing in the state] a 'free appropriate public education.'" *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (quoting 20 U.S.C. § 1412(a)(1)(A)).

States receiving public funds under the IDEA are required to provide a "free appropriate public education" ("FAPE") to "all children with disabilities." 20 U.S.C. § 1412(a)(1)(A); *see Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982). "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits, and provided in conformity with an individualized education program, or IEP." *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014)). An appropriate educational program begins with an individualized education program ("IEP") that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services. 34 C.F.R. § 300.320(a)(1), (a)(4); N.Y. Comp.

Codes R. & Regs. tit. 8, § 200.4(d)(2)(i), (iii), (v); *see Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (noting that education and related services "must be administered according to an IEP, which school districts must implement annually"); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (describing development of an IEP as a "centerpiece" of the IDEA); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (describing the IEP as "[t]he key element of the IDEA"). School districts are required to "prepare an IEP for disabled students annually, and those IEPs 'must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives.'" *Hardison*, 773 F.3d at 376 (quoting *Reyes*, 760 F.3d at 214). The IEP must be reviewed at least annually and revised in accordance with the child's needs. 20 U.S.C. § 1414(d)(2)–(4).

In New York, there are regulations in place to implement the IDEA, which "appear to track the IDEA closely." *Frank G.*, 459 F.3d at 363 (citation omitted); *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1, *et seq.* New York law tasks the creation of IEPs to Committees on Special Education ("CSEs"), which are comprised of, among others, members appointed by the board of education or trustees of the school district. *See Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998) (citing N.Y. Educ. Law § 4402(1)(b)(1)). CSEs "must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "In developing a particular child's IEP, a Committee on Special Education is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4)

managerial or behavioral needs." *Frank G.*, 459 F.3d at 363 (quoting *Walczak*, 142 F.3d at 123).

If a parent believes that the DOE has breached its obligations under the IDEA "by failing to provide their disabled child a FAPE, the parent[s] may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9–10, 16 (1993)). To seek such tuition reimbursement, a parent must first file a due process complaint with the DOE. The due process complaint initiates administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO"). *See id.*

> The three-pronged *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing: (1) the DOE must establish that the student's IEP [and identified class placement, if at issue,] actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them.

*Id.* (footnote omitted). The school district bears the burden of proof on the first and third prongs of the *Burlington/Carter* test. *See* N.Y. Educ. Law § 4404(1)(c). "Substantive inadequacy automatically entitles the parents to reimbursement, as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014) (internal quotation marks omitted).

The parents' "unilateral private placement is only appropriate if it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child.'" *Gagliardo*, 489 F.3d at 115 (quoting *Frank G.*, 459 F.3d at 365). It need not "meet the IDEA definition of a free appropriate public education." *Frank G.,* 459 F.3d at 364. Rather, the focus is on whether it is "reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted). The parents bear the burden of establishing the appropriateness of

their unilateral placement.  *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014).

The third prong of the *Burlington/Carter* analysis requires the court to consider equitable factors.  *See M.W.*, 725 F.3d at 135.  Courts have held that reimbursement may be reduced or denied "where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP."  *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) (listing cases).

"An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education."  *M.H. ex rel. P.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim*, 346 F.3d at 379–80); *see* N.Y. Educ. Law § 4404(2).  Any party who wishes to challenge the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court.  *See M.W.*, 725 F.3d at 135–36; 20 U.S.C. § 1415(i)(2)(A).  On a federal appeal, the district court receives "the records of the administrative proceedings" and, if requested, hears additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*

### B.    *Federal District Court Review of State Educational Decisions*

In IDEA cases, motions for summary judgment "serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled."  *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  For this reason, motions for summary judgment in IDEA cases are "an appeal from an administrative determination" that typically "trigger[] more than an inquiry into possible disputed issues of fact."  *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of*

*Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005). "[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo*, 489 F.3d at 112–13. The court must give "due weight to the state proceedings, mindful that [the court] lack[s] 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" *R.E.*, 694 F.3d at 189 (quoting *Gagliardo*, 489 F.3d at 113). "Keeping in mind this 'circumscribed' role, the district court 'engage[s] in an independent review of the administrative record and make[s] a determination based on a preponderance of the evidence.'" *M.B. ex rel. L.C. v. Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77–78 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).

"Courts generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.'" *M.H.*, 685 F.3d at 241 (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). Such deference is not absolute: the deference owed to an SRO's decision hinges on the quality of that opinion. Reviewing courts must look to the factors that "normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id*. at 244.

Where the IHO and SRO disagree, the general rule is that "courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246.

> However, when . . . the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.

*Id.* Therefore, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.

## II.    Factual Background

The following facts and procedural history are taken from the parties' submissions and the administrative record, which was filed under seal. (Doc. 15, the "Record".) Defendant also filed M.W.'s 2009 IESP under seal. (Doc. 25.)[1]

### A.    *M.W. and the 2012 IEP*

M.W. has been classified by the DOE as a child with a disability pursuant to the IDEA. (Jt. St. ¶ 1.) [2] Plaintiffs A.W. and T.W. are M.W.'s father and mother, respectively. (*Id.*) M.W. has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), for which he has been taking medication since fourth grade. (IEP 2; Ex. 2.)[3] M.W. attended a parochial school for the first through fifth grades, and during those years he was placed in a general education classroom. (Jt. St. ¶ 2.) M.W. was first found to be eligible for special education services in the third grade, and he has had an IEP each year since. (Tr. 318:4-15.)[4] In 2010, when M.W. was in the sixth grade, the Parents unilaterally placed M.W. at the Aaron School ("Aaron"). (Jt. St. ¶ 2.)

---

[1] An IESP is an "Individual Education Service Plan" and is distinct from an IEP.

[2] "Jt. St." refers to the Joint Statement of Material Facts Not in Dispute. (Doc. 20.) A certified record citation is provided for nearly every statement in the Joint Statement. Although labeled a "Joint Statement," Plaintiffs note that Defendant rejected each statement and rejected Plaintiffs' request that Defendant provide citations to the Record showing that each statement inaccurately characterized or paraphrased the evidence. (Memorandum of Law In Support of Plaintiffs' Summary Judgment Motion, (Doc. 19, "Pls.' Mem."), at 2 n.2.) Nevertheless, Defendant cites to the Joint Statement in the factual and procedural background section of its brief in support of its opposition and cross-motion. (Defendant's Memorandum of Law in Support of Its Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, (Doc. 23, "Def.'s Mem."), at 1, 3, 4.)

[3] "IEP" refers to M.W.'s 2012-2013 IEP, in the Record as the DOE's Exhibit 1. "Ex." refers to exhibits admitted into the Record at the Impartial Hearing. The DOE's exhibits are identified using numbers, and the Parents' exhibits are identified using letters.

[4] "Tr." refers to the Impartial Hearing Transcript provided in the Record.

Since that time—for the sixth through the eighth grades—M.W. has attended Aaron. (*Id.*) M.W. was thirteen years old and in the eighth grade during the 2012-2013 school year. (*Id.* ¶ 3.)

On April 16, 2012, the DOE's CSE held a meeting to develop an IEP for M.W. for the 2012-2013 school year (the "IEP Meeting"). (*Id.* ¶ 4.) The participants in the IEP Meeting were T.W.; Rose Fochetta, a school psychologist for the DOE; Feng Ye, a special education teacher with the DOE and Fochetta's "partner at work"; Matthieu Moss,[5] a teacher from Aaron who had taught M.W. in various subjects during the 2010-2011 and 2011-2012 school years; and Carmen Garcia, a parent member of the CSE. (*Id.*; Tr. 69:8-18.) During the meeting, the CSE reviewed a February 9, 2012 psychoeducational evaluation; a February 8, 2012 classroom observation conducted by Fochetta; and reports for terms 1 and 2 of the 2011-2012 school year from Aaron detailing M.W.'s performance. (Jt. St. ¶ 5.)

The psychoeducational evaluation indicated that despite being in the eighth grade, M.W.'s letter-word decoding skills were at an early fifth-grade level and that his skills appeared to deteriorate with more complicated words. (Ex. 4, at 2.) His language comprehension was below a fourth grade level. (*Id.*) He had increasing difficulty understanding the central meaning of verbal narratives that he had to read. (*Id.*) As narratives became more complicated and difficult, M.W. had more difficulty with actual word reading. (*Id.*) He had weaknesses in spelling and attention. (*Id.* at 2–3.) The psychoeducational evaluation also indicated that M.W.'s scores on the WISC-IV, commonly known as an "I.Q. test," were in the average range and that his scores in academic achievement, as measured by the Woodcock-Johnson test, were in the average to low-average range. (*Id.* at 2–4; Jt. St. ¶ 6.)

M.W.'s IEP for the 2012-2013 school year classified M.W. as having a learning

---

[5] Moss participated by telephone. (Tr. 69:17-18; IEP 14.)

disability. (Jt. St. ¶ 8; IEP 1.) The CSE recommended that M.W. be placed in an integrated co-teaching ("ICT") class with related services.[6] (Jt. St. ¶ 9; IEP 12.) In addition to the ICT, the IEP also recommended two sessions per week of occupational therapy to be administered within the classroom and a weekly counseling session to be conducted outside the classroom. (IEP 8.)

On or about July 31, 2012, the DOE sent the Parents a final notice of recommendation proposing P.S. 123 as the school at which the program recommended in the IEP would be implemented. (Ex. 3.) On August 15, 2012, the Parents sent a letter informing the DOE of their belief that M.W. "ha[d] not been offered an appropriate program/placement by the DOE for the 2012-13 school year," and of their intent to unilaterally place M.W. at Aaron for the 2012-2013 school year. (Ex. C.) The Parents signed a contract enrolling M.W. at Aaron on May 3, 2012. (Jt. St. ¶ 14; Ex. B, at 8–12.)

## B. *Impartial Hearing*

On August 15, 2013, the Parents commenced an impartial hearing by filing a due process complaint alleging procedural and substantive errors in the DOE's recommended program and proposed placement school. (Ex. A.) The due process complaint requested prospective payment or reimbursement for the child's unilateral placement at Aaron in the 2012-2013 school year, as well as reimbursement for transportation costs, related services and service authorizations (RSAs), and compensatory education.[7] (*Id.* at 5–6.)

A prehearing conference was convened on September 17, 2013. (IHO Ex. I.) The

---

[6] An ICT classroom is a general education classroom in which a maximum of twelve students with disabilities learn alongside nondisabled students, and which includes a full-time special education teacher in addition to the general education teacher. N.Y Comp. Codes R. & Regs. tit. 8, § 200.6(g). ICT is also known as a "collaborative team teaching class" or "CTT." In this order, I will refer to the recommended placement as an "ICT" class.

[7] At the Impartial Hearing, counsel for the Parents noted that only tuition was sought, and that the requests contained in the due process complaint for transportation costs, related services and related service authorizations, and compensatory education were withdrawn. (*See* Tr. 10:7-11:10.)

hearing was conducted over three non-consecutive dates: November 7, 2013; January 15, 2014; and February 26, 2014 (the "Impartial Hearing"). (IHO Op. 3.) [8] The record closed on March 25, 2014. (*Id.*)

At the Impartial Hearing, the DOE presented its case through documentary evidence, (*see* Exs. 1–11), and testimony from Rose Fochetta, (IHO Op. 4–9), and Maurice Collins, "a special education specialist supervisor and placement officer," (*id.* at 3–4).[9] In their case, the Parents introduced documentary evidence, (*see* Exs. A–I), and presented testimony of (1) Tracy Haber, the Educational Supervisor at Aaron, (IHO Op. 9–12); (2) Sari Biddelman, a head teacher and learning specialist at Aaron, (*id.* at 12–15); (3) T.W., (*id.* at 15–19); and (4) Matthieu Moss, the head math teacher at the Aaron upper school, (*id.* at 19–22).

Portions of Fochetta's testimony, as well as portions of the testimony of T.W., Moss, and Haber, are relevant to the issues in this case. Therefore, I address their testimony in turn below.

### 1. Fochetta Testimony

Rose Fochetta, a New York state certified school psychologist, (Tr. 62:2-13, 63:10-16), observed M.W. in a science class at Aaron on February 8, 2012, and prepared a report on that observation, (Jt. St. ¶ 7; Ex. 5). The class Fochetta observed lasted one hour, and had a student to teacher ratio of 9:1:1.[10] (Ex. 5, at 1.) During the classroom observation, M.W. repeatedly fiddled with items that were on the adult desk where he was sitting, and called out when he was

---

[8] "IHO Op." refers to the Findings of Fact and Order issued by Impartial Hearing Officer Nancy M. Lederman, Esq., provided as part of the Record.

[9] Maurice Collins's testimony appears to have been related to certain issues with the Parents' receipt of the DOE's mailings, including the final notice of recommendation. The IHO discounted Collins's testimony "as he clearly had no recollection of the circumstances of the case." (IHO Op. 27.) Although the DOE recites facts related to DOE's mailings, I do not rely on Collins's testimony in this order since neither party identified any issues concerning the communications between the DOE and the Parents as relevant to this case.

[10] "9:1:1" refers to the ratio of students to teachers to teaching assistants. Fochetta also noted that an Education Supervisor was present in the class she observed. (Ex. 5, at 1.)

not called upon to answer the teacher's questions.  (*Id.* at 1–2.)  During the class, the assistant teacher took out a "sensory tool box," and M.W. grabbed a red ball and began to manipulate the red ball.  (*Id.* at 2.)  Although M.W. continued to engage in the fidgeting behavior, "he remained engaged" in the classroom discussion and "he was able to participate throughout" the lesson.  (*Id.* at 2; Tr. 71:14-72:9, 114:3-115:1.)  At one point, he got up and walked around the room, and had to be directed to take his seat.  (Ex. 5, at 2.)

Fochetta stated that she was very familiar with Aaron, (Tr. 103:22-105:5), and acknowledged that they follow general education curriculum "[w]ith supports," (*id.* 105:6-15).  She testified that the curriculum being taught in the class she observed was "certainly appropriate."  (*Id.* 71:14-19.)  There were nine students in the class she saw, and that was the largest number of students in any of M.W.'s classes.  (*Id.* 106:1-107:15.)

At the CSE meeting, Fochetta expressed her opinion that M.W. was capable of handling a general education environment with a modified curriculum and that a 12:1:1 class and smaller settings were too restrictive for M.W.  (*Id.* 77:25-80:8.)  T.W. and Moss disagreed with these opinions.  (Ex. 2, at 2; Tr. 337:22-339:15, 428:25-429:16, 432:22-433:12, 445:11-18.)  During the Impartial Hearing, Fochetta testified concerning her opinion that, although M.W. attended small classes at Aaron, he could function in an ICT class of approximately thirty students because, before attending Aaron, he had attended a general education Catholic school, where, beginning in around fourth grade, he received special education teacher supports.  (Tr. 79:13-80:8.)

### 2. Haber Testimony

Tracy Haber was M.W.'s head teacher in sixth grade (2010-2011 school year); his math teacher in seventh grade (2011-2012 school year); his history teacher in eighth grade (2012-2013

school year); and provided him with additional homework support in ninth grade (2013-2014 school year).  (*Id*. 187:2-10.)  Haber testified that M.W. has "a really hard time maintaining attention during class" and was "constantly . . . getting up," which required getting his attention back.  (*Id*. 187:14-23.)  Haber testified that M.W. has "a lot of difficulty with executive functioning . . . ."  (*Id*. 187:23-25.)  This difficulty manifested itself in various ways, including in his organization (both of his materials and of his writing) and time management.  (*Id*. 188:1-17.)  Specifically, Haber testified that

> A lot of times [M.W. will] leave things in one class, you know, in the previous class and then go to the next class.  He'll leave things at home that he needs or leave things at school that he needs to take home.  And that also manifests in his writing.  He has a hard time organizing, you know, anything he needs to write.  And then it also affects his ability to time manage so, you know, when he has to study for a test or if he has to plan a project he needs a lot of support in doing that.  And then in terms of [M.W.'s] reading, he has a hard time with reading comprehension.  He does a lot better with listening comprehension because he does understand a lot of concepts, but he has a hard time, you know, making that transition from reading it to understanding itself himself.

(*Id*. 188:1-17.)

### 3. Moss Testimony

Matthieu Moss, the head math teacher at Aaron, served as M.W.'s science teacher during sixth grade, head teacher—teaching science and humanities—during the seventh grade, and during the eighth and ninth grades would help M.W. with his homework in the morning— although Moss was not M.W.'s teacher at the time.  (*Id*. 411:16-25.)  Moss described in detail the extra supports provided to M.W. at Aaron that were not included in the IEP.  (*See id*. 426:9-428:24.)  Moss testified that M.W. was "easily frustrated by a lot of noise, and voiced it out loud to staff members consistently, including [to Moss] and the teacher, and would get off topic easily, if there were either peer noise or outside classroom noise, and would need to be redirected."  (*Id*. 429:21-430:1.)  If M.W. was very distracted, he sometimes took breaks outside

the classroom to gather himself, with the assistant teacher. (*Id.* 431:17-19.) Moss testified that because of his distractibility, M.W. needed a small class size for his core subjects, in lunch and gym, and during transitions, (*id.* 429:6-16), and that even though M.W.'s testing showed average scores, because of his executive functioning needs, he would not be able to complete his work without extended supports such as those he receives at Aaron. (*Id.* 445:11-18.) Moss also testified that the ICT class proposed "is way too big for [M.W.] to effectively learn." (*Id.* 433:9-12.)

### 4. T.W. Testimony

T.W., M.W.'s mother, testified that M.W. was first found to be eligible for special education services in the third grade and that he has had an IEP each year since. (*Id.* 318:4-15.) Prior to enrolling at Aaron, M.W. attended a parochial school. (*Id.* 400:4-6.) T.W. testified about the CSE meeting on April 16, 2012, noting that she informed those assembled at the meeting that socially, M.W. was not a regular education student. (*Id.* 338:25-339:15.) She testified that M.W. was not able to "keep up with conversation" with a peer his age, "so there would be other social issue[s] of him being in a regular ed[ucation] class." (*Id.* 339:9-15.) During the CSE, certain DOE representatives told T.W. that "they felt that [M.W.] needed to be part of general ed[ucation] and that they wanted him to go into a classroom with [she] believe[d] they said up to—that the Board of Ed[ucation] allows up to almost 30 students and that a certain amount of those students in the class would be special ed[ucation] or have IEPs and that there would be a special education teacher that was with those IEP students." (*Id*. 338:1-9.) T.W. pointed out that the previous year M.W. was recommended—presumably in M.W.'s IEP—to be in a smaller classroom size with two teachers. (*See id*. 338:25-339:3.) T.W. was told by Rose Fochetta and Feng Ye that a placement in a regular education class might improve M.W.'s social

skills; however, neither Fochetta nor Ye explained the basis for their belief or how such improvement would happen.  (*Id.* 339:16-24.)  T.W. stated that she thought the program recommendation decision had been made before the IEP meeting and before she or Moss spoke about M.W.'s challenges and goals, because neither Fochetta nor Ye discussed any other recommendations and they told her that they reached their decision on M.W.'s program recommendation "based on the paperwork."  (*Id.* 340:3-342:2.)

T.W. described M.W. as being ambidextrous, and that the occupational therapist explained that he had hesitation when he went to write, which was painfully slow because he must first determine in which direction the words were properly written, so taking notes in a classroom was difficult for him.  (*Id.* 342:21-343:14.)  T.W. stated that she "didn't understand how a 3.8 [referring to M.W.'s reading grade level] with ten other children that have IEPs and one other adult that's special ed[ucation], how he was going to keep up with eighth grade work," (*id.* 341:8-13) and that she "couldn't imagine him being able to keep up with [an ICT] classroom," (*id.* 343:13-14).  She voiced these concerns but was told that "co-teaching had been successful," and that "[M.W. was] a good candidate for it and [her] objections had been noted; however, the Board of Ed[ucation] was recommending that this was the best path for [M.W.]" (*Id.* 341:20-25.)

## C.   *The IHO Decision*

Nancy M. Lederman, Esq, the IHO, rendered her decision on March 28, 2014 (the "IHO Decision").  (Jt. St. ¶ 17.)  The IHO explained that "[a]n appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services."  (IHO Op. 22.)  In her decision, the IHO found that the DOE failed to

provide M.W. with a FAPE because it failed to justify the program recommendation of an ICT class. (*Id*. at 22-25.) The IHO's conclusion was well-reasoned and weighed the considerable evidence provided by the parties. To summarize the IHO's detailed opinion, the IHO reasoned that, given M.W.'s "undisputed . . . weaknesses in spelling, understanding what he was reading, executive functioning, organization, attention, time management, and writing long assignments . . . Fochetta's reliance on [M.W.] being 'cognitively intact' did not justify her conclusion that he had to be in a class with a general education population." (*Id*. at 23.) The IHO found that Fochetta's statement that M.W. had done "okay" in a general-education parochial school setting "failed to accurately portray the child's educational history" and was "simply unsupported and inaccurate, given the significant support services for his disabilities [M.W.] had received from the DOE when still in early grades and the small classroom setting and more intense support he had been receiving at [Aaron]" by April 2012. (*Id*.)

The IHO found Fochetta's "conclusions concerning [M.W.'s] reading comprehension and distractibility minimized the extent of his deficits and the effect on [M.W.'s] learning." (*Id*.) The IHO noted that Fochetta argued that M.W. remained engaged in the class she observed even though he exhibited increased distractibility; however, she failed to take into account the fact that she observed M.W. in a class of only nine students. (*Id*.) In addition, the IHO "note[d] the very specific description of [M.W.'s] difficulties in motor control and need to move around," in finding that M.W.'s "sensory needs . . . could not be supported by the recommended twice weekly [occupational therapy] services pushed into the classroom." (*Id.*)

The IHO found that the CSE, in opining that a larger class would not be overwhelming for M.W., "failed to address the central issue of whether he would be likely to receive educational benefit in the recommended program," (*id.* at 23–24), and failed to adequately

explain "why a smaller class would not be appropriate," (*id.* at 24). Rather, "the reasoning advanced by the DOE did not amount to reasonable justification for the child's placement in an ICT class" and "[t]he CSE response that it was too restrictive was a cookie cutter response that failed utterly to address the many special education needs displayed by [M.W.]" (*Id.*) The IHO further found that Fochetta's conclusion that decoding "wouldn't necessarily help [M.W.]" ignored the explicit assessment of the DOE's psychoeducational evaluation that M.W.'s decoding skills deteriorated with complicated words. (*Id.* at 23.) The IHO noted, and credited, Moss's testimony concerning the importance of a small class size to meet M.W.'s attentional needs and his opinion that issues such as attention, distractibility, frustration with noise, vocalizations, and sensory needs made an ICT class inappropriate for M.W. (*Id.* at 24.)

The IHO then analyzed the second prong of the *Burlington/Carter* test, and found that Aaron was an appropriate unilateral placement for M.W. because it offered a program designed to meet his individual special education needs. (*Id.* at 25–26.) The IHO noted that the Aaron witnesses were uniform in describing M.W.'s deficits, emphasizing his distractibility and difficulties with decoding and comprehension, writing, math, executive functioning, and motor skills. (*Id.* at 25.) In addition, the IHO emphasized that the small classes and adult support at Aaron cited by all witnesses were important in addressing M.W.'s needs. (*Id.*) The IHO summarized the extensive testimony by Haber, Moss, and T.W. regarding M.W.'s improvements in reading, writing, organization, and math while at Aaron. (*Id.* at 25–26.) The IHO also acknowledged Fochetta's testimony that M.W. was "doing fine" at Aaron and that the curriculum in the class she observed was "certainly appropriate." (*Id.* at 26.)

Finally—noting the Parents' clearly stated objections at the IEP meeting—the IHO found that equitable considerations do not operate to deny or reduce an award of funding or

reimbursement to the Parents for M.W.'s Aaron tuition or services.  (*Id.* at 27.)  In other words, the IHO found that nothing that the parents did or did not do warranted the denial or reduction of reimbursement if they were otherwise entitled to such reimbursement.

### D.    *The SRO Decision*

The DOE appealed portions of the IHO Decision to the New York State Office of State Review, and on January 9, 2015, SRO Carol H. Hauge sustained the DOE's appeal, holding that the evidence in the hearing record demonstrated that DOE had met its burden to establish that it had offered M.W. a FAPE for the 2012-13 school year, (the "SRO Decision").  (Jt. St. ¶ 20.) Specifically, the SRO held that, "given the student's overall average cognitive and academic abilities, along with the student's need for support in the areas of executive functioning and reading comprehension, the hearing record supports a finding that the April 2012 CSE's recommendation for ICT services, along with the other accommodations, annual goals, [occupational therapy], and counseling services included on the IEP, was reasonably calculated to provide the student with educational benefit."  (SRO Op. 6.)[11]  The SRO did not reach the second or third prongs of the *Burlington/Carter* test, and therefore did not address the issues of whether Aaron was an appropriate placement or whether equitable considerations weighed in favor of the Parents' request for tuition reimbursement.  (*Id.* at 7.)  It appears that the Parents did not challenge P.S. 123's ability to implement the program recommended in the IEP, but only challenged the IEP's program recommendation.

---

[11] "SRO Op." refers to the SRO Decision, dated January 9, 2015, and provided in the Record.

### III. <u>Procedural History</u>

The Parents commenced this action by filing a complaint on May 6, 2015.  (Doc. 1.)  The DOE answered the complaint on June 26, 2015.  (Doc. 5.)  As is typical with challenges under the IDEA, the parties proceeded directly to filing cross-motions for summary judgment.  Plaintiffs filed their motion, (Doc. 18), with a memorandum of law in support, (Doc. 19), and a joint statement of undisputed fact, (Doc. 20), on December 23, 2015.  On January 25, 2016, the DOE filed its cross-motion for summary judgment, (Doc. 21), with a declaration, attaching an exhibit, (Doc. 22), and a memorandum of law in support, (Doc. 23).[12]  Plaintiffs filed their reply on February 25, 2016, (Doc. 26), and the DOE filed its reply on March 25, 2016, (Doc. 27).

### IV. <u>Discussion</u>

#### A. *The SRO Decision Is Not Deserving of Deference*

Based on an independent review of the administrative record and the decisions of the IHO and SRO, I find that the SRO Decision is not deserving of deference.

The SRO Decision ignores much of the record evidence and the findings of the IHO based upon that evidence, and relies on flawed logic to find that M.W. was offered a FAPE:

> [Fochetta] indicated that during the classroom observation—the class consisted of one teacher, a teacher assistant, and nine students despite the student's difficulties with attention—he focused, took notes, and responded to teacher questions, which supports the conclusion that the student could function within a larger general education placement with ICT services.  The February 2012 psychoeducational evaluation report that the April 2012 CSE reviewed did not indicate the student required a small class to exhibit progress.  Additionally, according to the 2011-12 Aaron School student reporting system reports, the student performed well academically; *however, the reports did not indicate that the student could not make progress in a larger class setting*.

(SRO Op. 5 (internal citations omitted) (emphasis added).)  First, the SRO's conclusion that

---

[12] The exhibit attached to the DOE's declaration is a copy of M.W.'s IESP dated January 28, 2009, and has been filed under seal.  (*See* Docs. 24, 25.)

Fochetta's classroom observation—during which M.W. focused, took notes, and responded to teacher questions—supports the conclusion that M.W. could function within an ICT class, (*id.*), defies logic. The fact that M.W. obtained an educational benefit in a class with a student-to-teacher ratio of 9:1:1 does not, without more, support a conclusion that he could obtain the same benefit in an ICT class of up to thirty students with a student-to-teacher ratio almost three times as large. In fact, at best, the observation could be said to be evidence that the class size and supports provided at Aaron were adequate to meet M.W.'s educational needs.

Second, the SRO's reliance on the fact that the 2011-2012 Aaron progress reports did not indicate that M.W. could not make progress in a larger class setting, (*id.*), is similarly illogical. The purpose of a teacher's evaluation of a student is to discuss the student's progress in the student's current placement, not to opine as to whether a different type of placement might or might not also allow the student to obtain an educational benefit. Therefore, since an opinion/analysis concerning M.W.'s ability to make progress in a larger class size is not something that is required or even expected to be contained in such progress reports, the absence of such an opinion/analysis proves nothing. Stated another way, any omissions as to what alternative educational settings in which M.W. might achieve a benefit cannot be read as support for the finding that M.W. could in fact make educational progress in alternative settings. Using the SRO's logic, the fact that the progress reports did not state that M.W. could not progress in a class of forty, fifty, or even 100 students and one teacher would somehow point to the conclusion that he could make progress in such environments.

Third, the SRO uncritically relied on Fochetta's testimony concerning the adequacy of the ICT class to meet M.W.'s needs, (*see id.* at 6), and did not discuss Moss's testimony (1) that M.W. was "easily frustrated by a lot of noise, and voiced it out loud to staff members

consistently . . . and would get off topic easily, if there were either peer noise or outside classroom noise, and would need to be redirected," (Tr. 429:21-430:1); (2) that because of his distractibility, M.W. needed a small class size for his core subjects, in lunch and gym, and during transitions, (*id.* at 429:6-16); (3) that the ICT class is "way too big" for M.W. to effectively learn, (*id.* at 433:9-12); and (4) that even though M.W. tests on an average level, due to his executive functioning needs, without extended supports similar to what he received at Aaron, he would not be able to complete his work, (*id.* at 445:11-18). Indeed, the SRO only mentioned Moss's testimony in general terms. (SRO Op. 5 (noting that M.W.'s Aaron School teacher indicated that M.W. required a small class).) The SRO did not engage in any critical analysis, or any analysis for that matter, of the various issues raised by Moss's testimony.

In short, the SRO Decision relies solely on illogical arguments and testimony from one CSE participant who observed M.W. for one hour, while disregarding the testimony of T.W. and the Parents' witnesses, including Moss, who had much more experience working with M.W. I find that the SRO Decision was not "well-reasoned" or "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *F.O. ex rel. Brendan O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 515 (S.D.N.Y. 2013) (finding that "it is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision"); *C.L. ex rel. H.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676(JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 F. App'x 81 (2d Cir. Jan. 27, 2014), *as amended* (Feb. 3, 2014) (SRO's decision merited no deference where SRO did not grapple with contrary evidence and gave no explanation for why it credited unfounded assertions of a school psychologist who had observed student for an hour and a quarter over cogent testimony of multiple highly-credentialed teachers who had worked closely with student for a full school

year); *M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 166 n.18 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012) (deferring to IHO's decision where the SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis).

**B.    *The IHO Decision Is Entitled to Deference***

**1.    IEP Did Not Offer M.W. a FAPE**

By contrast, the IHO critically examined Fochetta's conclusions concerning the appropriateness of an ICT class in light of the undisputed evidence concerning M.W.'s educational history and behavior, and the undisputed results of the psychoeducational evaluation. The IHO reasoned that, given M.W.'s many deficits, the fact that he was "cognitively intact" did not justify Fochetta's conclusion that he should be in a general education classroom.  (IHO Op. 23.)  The IHO noted that, while Fochetta observed that M.W. remained engaged in the class she observed even though he exhibited increased distractibility, Fochetta failed to take into account the fact that she observed him in a class of only nine students.  (*Id.*)  The IHO concluded that M.W.'s sensory challenges—difficulties in motor control and need to move around—could not be adequately addressed by twice-weekly in-classroom occupational therapy services.  (*Id.*)  The IHO found that Fochetta's conclusion that decoding "wouldn't necessarily help [M.W.]" ignored the psychoeducational evaluation's explicit assessment that M.W.'s decoding skills deteriorated with complicated words.  (*Id.*)  The IHO further concluded that the CSE team failed to adequately explain why a smaller class would not be appropriate, and dismissed its response that such a class was too restrictive as "a cookie cutter response that failed utterly to address the many special education needs displayed by [M.W.]"  (*Id.* at 24.)  I am "persuaded by the IHO's reasoning, and . . . thus defer to the IHO's conclusion" that the proposed program in the IEP did not offer M.W. a FAPE.  *See C.L.*, 744 F.3d at 840.

The DOE argues that I should not defer to the IHO Decision in part because the IHO misquoted Fochetta as testifying that M.W. had done "okay" in parochial school when Fochetta was actually referring to M.W.'s performance at Aaron.  (Def.'s Mem. 18.)  However, as the DOE acknowledges, the misquote is not "substantively important," (*id.*), and it therefore does not alter my analysis.

The DOE also contends that the IHO Decision does not merit deference because it discredited Fochetta's testimony based in part on the assumption that M.W. had received "significant support services for his disabilities . . . from the DOE when still in early grades," (*id.* 18–19), even though M.W. received only an IESP beginning in about fourth grade, (Tr. 79:19-80:8).  As an initial matter, T.W.'s testimony indicates that M.W. had an IEP every school year since the third grade.  (*Id.* 318:4-15.)  Even if the services M.W. received prior to enrolling in Aaron were not as supportive as those proposed in the IEP, the simple fact that M.W. "already sat in a general education setting for many years without the types supports [proposed in the IEP]," (*id.* 80:3-8), does not lead to Fochetta's conclusion that a general education setting would be appropriate for M.W. several years later during the 2012-2013 school year.  Without examining how M.W.'s needs during elementary school compared to his needs as an eighth grader, or how M.W. performed in the general education setting in elementary school, Fochetta's reasoning has no basis in fact and is speculative.  I therefore find no reason to disagree with the IHO's conclusion with respect to whether the IEP offered M.W. a FAPE.

### 2.  M.W.'s Placement in the Aaron School Was Appropriate

Because the SRO reversed the IHO's decision based on the first prong of the *Burlington/Carter* test, the SRO did not reach the second or third prongs and therefore did not address the issue of whether Aaron was an appropriate placement for M.W. or whether equitable

considerations weighed in the Parents' favor.  (SRO Op. 7.)  The parties assert that the only issue

before me, as a result, is whether the IEP was appropriate to meet M.W.'s needs.  (Pls.' Mem. 1;

Def.'s Mem. 5.)

Nevertheless, a district court, based on the preponderance of the evidence, "shall grant

such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  In particular,

courts in this Circuit have decided issues not considered by the SRO—rather than remanding the

case to the SRO—when the IHO adequately considered the issues.  *See, e.g.*, *M.H.*, 712 F. Supp.

2d at 163 ("Because the SRO made no specific findings with respect to the appropriateness of the

[unilateral placement] . . . the Court must defer to the findings and conclusions of the IHO

insofar as they are well 'reasoned and supported by the record.'" (quoting *Gagliardo*, 489 F.3d at

114))*; F.O.*, 976 F. Supp. 2d at 521 ("Because the SRO did not address the issue of whether the

unilateral placement was appropriate, deference is owed to the IHO's opinion."); *N.Y.C. Dep't of

Educ. v. V.S.*, No. 10-CV-05120(JG)(JO), 2011 WL 3273922, at *10 (E.D.N.Y. July 29, 2011)

(noting that "the drawbacks of remanding the case to the SRO outweigh the benefits, particularly

where one state administrator has already provided a thoughtful opinion on the merits of the

case").  Therefore, I address the second prong of the *Burlington/Carter* test.[13]

I find that the IHO engaged in a well-reasoned analysis rooted in the record to conclude

that the Parents met their burden to establish that their unilateral placement was appropriate.  The

IHO observed that the small classes and adult support offered at Aaron appropriately addressed

M.W.'s distractibility and attentional needs, emphasizing the provision of "highlighting,

previewing, scaffolded directions, outlines, sensory tools, and strategies."  (IHO Op. 25.)  The

---

[13] I note that, according to Plaintiffs, the DOE only appealed the IHO's rulings to the SRO on the first and third prongs of the *Burlington/Carter* test.  (Pls.' Mem. 11.)

IHO emphasized M.W.'s recorded improvements in reading, writing, organization, and math while at Aaron. (*Id.* at 25–26.) In addition, the IHO noted Fochetta's testimony that M.W. was "doing fine" at Aaron, that the curriculum in the class she observed was "certainly appropriate," and that Aaron follows what is expected for a general education curriculum, but with substantial supports, including small classes and even smaller reading groups. (*Id.* at 26.) M.W.'s "progress, viewed together with small class size and the program offered at [Aaron], is sufficient to support" the conclusion that M.W. received educational benefits. *See Frank G.*, 459 F.3d at 367. Therefore, based on the evidence cited by the IHO, as well as other evidence in the record, I agree with the IHO's conclusion that Aaron provided M.W. an education specifically designed to meet his unique needs. *See id.* at 365.

### 3.      Equitable Considerations Favor Parents

The SRO also declined to reach the third prong of the *Burlington/Carter* test, (SRO Op. 7), but because the IHO performed a reasoned and evidence-based analysis, I defer to the findings of the IHO, *see M.H.*, 712 F. Supp. 2d at 163. The IHO noted that the IDEA provides that an award of tuition reimbursement may be reduced or denied if the parents, at the most recent CSE meeting prior to removal, neither inform the CSE of their objections to the proposed placement and their intent to place their child at a private school at public expense nor provide the DOE with written notice of such information ten business days before removal. (IHO Op. 26–27 (citing 20 U.S.C. 1412(a)(10)(C)(iii).) The IHO found that the Parents adequately voiced their objections to the IEP at the IEP meeting. (*Id.* at 27.) In addition, while there were difficulties in sending the IEP and the final notice of recommendation to the Parents, the Parents informed the DOE of their objections to the proposed placement and their intent to place M.W. at Aaron in a letter dated April 29, 2012 and again in a letter dated August 15, 2012. (Ex. C, at 1.)

I therefore agree with the IHO that equitable considerations do not require a reduction or denial of tuition reimbursement to the Parents.

## V.     Conclusion

For the reasons stated herein, Plaintiffs' motion for summary judgment is GRANTED, and Defendant's cross-motion for summary judgment is DENIED.  Defendant is hereby ordered to reimburse Plaintiffs for tuition paid to the Aaron School in the amount of $8,000 upon submission of proof of payment and to pay the remaining tuition balance directly to the Aaron School for the 2012-2013 school year, the total amount of tuition reimbursement and direct payment not to exceed $49,925.  The parties are directed to confer in an effort to reach an agreement concerning attorneys' fees.  If no agreement is reached, Plaintiffs shall submit a fee application on or before March 30, 2018.  The Clerk of Court is respectfully directed to terminate the motions located at docket numbers 18 and 21.

SO ORDERED.

Dated: February 21, 2018
        New York, New York

Vernon S. Broderick
United States District Judge